# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

EDDIE W. STAMPER,
     Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant.

Case No. 1:20-cv-467
Black, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Eddie W. Stamper brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications for disability insurance benefits (DIB) and supplemental security income (SSI).  This matter is before the Court on plaintiff's Statement of Errors (Doc. 13), the Commissioner's response in opposition (Doc. 19), and plaintiff's reply (Doc. 21).

## I.  Procedural Background

Plaintiff filed applications for DIB and SSI on March 16, 2017, alleging disability since January 31, 2016, due to Post-Traumatic Stress Disorder (PTSD), depression, anxiety, explosive anger, degenerative disc disorder, arthritis in all major body parts, asthma, heart palpitations, excess weight, borderline bipolar, sciatica nerve problem, asthma with epilepsy but no seizures, and heart damage in the left ventricular.  (Tr. 72-73, 90-91).  The applications were denied initially and upon reconsideration.  Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative law judge (ALJ) Deborah F. Sanders.  Plaintiff and a vocational expert (VE) appeared and testified at the ALJ video hearing on March 4, 2019.  On

May 31, 2019, the ALJ issued a decision denying plaintiff's DIB and SSI applications.  This decision became the final decision of the Commissioner when the Appeals Council denied review on April 15, 2020.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI).  The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four steps of the sequential evaluation process.  *Id.*; *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004).  Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy.  *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

**B.  The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. [Plaintiff] meets the insured status requirements of the Social Security Act through June 30, 2021.
>
> 2. [Plaintiff] has not engaged in substantial gainful activity since January 31, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. [Plaintiff] has the following severe impairments: Bipolar disorder with depression and/or major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder, moderate bilateral acromioclavicular joint arthrosis, mild degenerative disc disease of the spine, polyarthralgia and minimal degenerative changes in other areas (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, [the ALJ] finds that [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) being able to lift and carry up to 20 pounds occasionally 10 pounds frequently; except stand and/or walk at least 6 hours out of an 8 hour day and sit at least 6 hours out of an 8 hour day with the need to alternative between sitting and standing and walking every thirty minutes with 1-2 minutes to change position; never climbing ladders, ropes, and scaffolds; frequently stoop, kneel, crouch, and crawl; frequent handling and fingering; frequent overhead reaching; never work at unprotected heights or around dangerous machinery; can understand, remember and carry[ ]out short cycle work with no fast production rate pace or strict production quotas; occasionally interact with coworkers but no tandem or shared tasks; occasionally interact with supervisors; occasionally interact with the public but not in a customer service capacity; adapt to a work environment with infrequent changes as long as the changes were explained in advance.

6. [Plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[1]

7. [Plaintiff] was born [in] . . . 1966 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  [Plaintiff] subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. [Plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [plaintiff] is "not disabled," whether or not [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).[2]

---

[1] Plaintiff's past relevant work was as an injection molding machine operator, a medium exertional level, skilled job (SVP 5); a press tender, a medium exertional level (performed at heavy), unskilled job (SVP 2); and a general inspector, a light exertional level, semi-skilled job (SVP 4).  (Tr. 29, 64).
[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of approximately 2.5 million unskilled, light exertional level, SVP 2 jobs in the national economy, including warehouse checker (90,000 jobs), marker (85,000 jobs), and electronics worker (100,000 jobs).  (Tr. 30, 66).

11. [Plaintiff] has not been under a disability, as defined in the Social Security Act, from January 31, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-30).

### C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.  Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).

*See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

####    D.    Relevant Medical Evidence

####       1.    Emergency treatment

Following a motor vehicle collision, plaintiff underwent a CT of his cervical spine in December 2015, which reflected no abnormal findings. (Tr. 501). Plaintiff also underwent lumbar x-rays in December 2015, which reflected "minimal degenerative disc disease . . . greatest at L3-L4" but "[n]o evidence of acute compression fracture or other acute osseous injury in the lumbar spine." (Tr. 505).

In November 2016, plaintiff presented to the emergency department at Atrium Medical Center with primarily left hip pain after falling down steps outside his house. (Tr. 483, 485). He exhibited no abnormalities related to his cardiovascular system, pulmonary system, back, or mental state. (Tr. 486-87). He exhibited normal range of motion, no bruising or swelling, left upper extremity tenderness at the radial aspect of the wrist and elbow, left hip tenderness, mild tenderness over his left knee, and a slight limp with walking. (Tr. 487). X-ray imaging of his left elbow, wrist, hip, knee, and pelvis was normal. (Tr. 490-92).

In January 2017, plaintiff presented to the emergency department at TriHealth, describing "squeezing chest pain that radiated down his [left] arm" after being "upset and crying. . . ." (Tr. 509, 1108-09). On examination, his respiratory, cardiovascular, gastrointestinal, and

musculoskeletal systems were entirely normal and he exhibited no psychiatric abnormalities.

(Tr. 511-12).  A CT scan, stress test, and echocardiogram were all normal.  (Tr. 1109).

> 2.  <u>Vijaya Reddy, M.D. (treating physician) and other UC Health primary care providers</u>

Plaintiff saw his primary care physician Dr. Reddy on December 14, 2016.  (Tr. 700).

She noted normal psychiatric findings, with plaintiff reporting "significant relief" from his

intermittent, chronic depression with treatment.  (Tr. 700, 702).  She noted "no edema" or other

abnormal musculoskeletal findings, though plaintiff reported chronic, intermittent, "moderate"

back pain, which was only mildly relieved by the use of NSAIDs.  (*Id.*).  She assessed right

bundle branch block, palpitations, chest pain, back pain, adjustment disorder, migraines, mood

disorder, and cervical spine pain.  (702-03).  She prescribed a trial of Meloxicam and refilled his

psychotropic medications, but she also emphasized that plaintiff needed to consult with a

psychiatrist as soon as possible (Tr. 703).

Plaintiff saw Dr. Reddy again  in March 2017 regarding his hypertension and allergies.

(Tr. 705).  He reported that his depression was "stable" with his medication regimen, and his

physical exam reflected no psychiatric abnormalities.  (Tr. 711-12).  Plaintiff also reported that

Naprosyn controlled his osteoarthritis and degenerative joint disease.  (Tr. 713).  Plaintiff

returned to Dr. Reddy in April 2017 regarding his palpitations and hyperlipidemia.  (Tr. 723).

Dr. Reddy noted that plaintiff had not been exercising as recommended.  (*Id.*).  Plaintiff's

physical examination (including his mood, affect, and level of distress) was normal.  (Tr. 724).

On June 19, 2017, plaintiff presented to Vij Malti, M.D., with palpitations occurring

when he did not take his Metoprolol and reported two episodes where he became red-faced and

dizzy.  (Tr. 735).  Plaintiff denied passing out, racing heart, leg swelling, or chest pain and said

he otherwise felt fine.  (*Id.*).  Plaintiff complained of memory problems, arthralgias, and sleep

disturbance.  (Tr. 735).  Plaintiff reported speaking to a counselor weekly and that he was seeing

a psychiatrist; on mental status examination, he was found to be depressed. (Tr. 735-36).

On June 29, 2017, plaintiff saw Daniel M. Tanase, M.D.  He reported chest pain,

palpitations, leg swelling, arthralgias, gait problems, neck pain, depression, behavioral problems,

confusion, decreased concentration, and agitation.  (Tr. 1244).  On examination, however,

plaintiff exhibited normal range of motion, no edema, no tenderness, normal mood and affect,

normal behavior, and normal judgment and thought content.  (*Id.*).  The next day, plaintiff

returned to Dr. Malti regarding tinnitus and "welfare paperwork[.]"  (Tr. 745).  Plaintiff

exhibited normal musculoskeletal findings but swelling of both hands, tenderness on

metacarpophalangeal and distal phalangeal joints, and restricted range of motion in his left

shoulder.  (Tr. 749).  Dr. Malti assessed generalized arthritis with bilateral hand pain and chronic

low back pain with sciatica and referred plaintiff to rheumatology.  (Tr. 751).

Plaintiff returned on July 10, 2017 for disability paperwork and saw Dr. Reddy.  (Tr.

758).  Describing his present illnesses, Dr. Reddy noted mild chronic, intermittent, waxing and

waning back pain that does not radiate and is aggravated by bending, twisting, and standing.  (Tr.

762).  She also noted chronic, rarely occurring depression that is significantly relieved with

treatment.  (*Id.*).  On physical examination, plaintiff exhibited only tenderness with respect to his

musculoskeletal system and no abnormal psychiatric findings.  (Tr. 764).

On this same date, Dr. Reddy completed a residual functional capacity (RFC) questionnaire. (Tr. 769-76). Here, Dr. Reddy indicated that plaintiff would frequently have pain severe enough to interfere with his attention and concentration for even simple work tasks, could walk less than one block before needing rest or experiencing severe pain, and could sit only 30 minutes and stand 20 minutes at a time. (Tr. 774). She also indicated that plaintiff was limited to sitting or standing/walking less than two hours per work day. (Tr. 775). She further indicated that plaintiff could rarely lift and carry less than 10 pounds, could rarely twist or bend, and could never crouch/squat, climb ladders, or climb stairs. (Tr. 776). She found no limitations on plaintiff's reaching, handling or fingering abilities. (*Id.*). Finally, she estimated that plaintiff was likely to miss more than four days per month of work. (*Id.*).

Plaintiff saw Christine Chhakchhuak, M.D., on September 27, 2017, who indicated that the x-rays, a CT scan, and MRI performed at TriHealth showed degenerative joint disease in different regions. (Tr. 1161). She also found diffuse tenderness on examination a recorded a body mass index of 41.50. (*Id.*). She recommended aquatic therapy and sleep medicine. (Tr. 1162).

In 2018, the record reflects two office visits on January 11 and December 19. (Tr. 1360). At the first visit, plaintiff reported heart palpitations and weight gain attributable to medications but no other complaints. (*Id.*). At the second visit, all examination findings were normal. (Tr. 1363).

Plaintiff saw Dr. Reddy again in January 2019, complaining primarily of bilateral shoulder pain that did not improve with rest. (Tr. 1385). He also complained of new right knee

pain from a fall at work, but he had not pursued symptom treatment. (*Id.*). On examination, plaintiff exhibited normal mood and affect and was not in distress. (Tr. 1386-87). His body mass index was down to 34.38. (Tr. 1386). He exhibited restricted range of motion in both shoulders and tenderness but no edema. (Tr. 1387). Dr. Reddy ordered x-rays of both shoulders and prescribed menthol gel. (*Id.*). The x-rays reflected moderate bilateral acromioclavicular joint arthrosis, slightly worse on the right side. (Tr. 1380). Plaintiff returned to Dr. Reddy in February of 2019 complaining primarily of hip pain but also reporting abdominal pain. (Tr. 1388). On examination, he exhibited no abnormal psychiatric findings but some musculoskeletal tenderness without edema. (Tr. 1390).

        3.    <u>Barry Reid, D.C.</u>

Plaintiff received chiropractic treatment from Dr. Reid beginning in December 2015 under the diagnoses of cervicalgia, pain in the thoracic spine, low back pain, pain in the left shoulder, and unclassified vascular headache. (Tr. 455). Dr. Reid noted that plaintiff was injured at work on September 22, 2015, when his left leg slipped after stepping on a chain. (Tr. 450). In March 2016, Dr. Reid sent a letter to Butler County Job and Family Services requesting that plaintiff be limited temporarily to light duty work until his treatment was finished. (Tr. 479). By April 2016, plaintiff was reporting improvements in pain, range of motion, and sleep. (Tr. 473). He also noted his pain level at one out of ten, with ten being the most severe. (Tr. 478). Plaintiff resumed chiropractic care, with some gaps, between July 2017 and June 2018 for leg/sciatic pain/stiffness. (Tr. 1046-68).

4.      Atrium Medical Center (physical therapy)

Plaintiff attended three physical therapy sessions in January 2018.  (Tr. 1091-1105).

Examinations by the therapist reflected that plaintiff had problems with forward bending

mobility, functional mobility and muscle performance, hip range of motion, limited standing

tolerance, limited walking tolerance, and limited bending and lifting abilities.  (Tr. 1093-94).

5.      Access Counseling Services/Rokeya Tasnin, M.D. (treating psychiatrist)

Plaintiff sought mental health treatment from June 2016 through April 2017.  (Tr. 550-

99).  At his first visit on June 13, 2016, plaintiff presented with symptoms of PTSD related to

traumatic events including witnessing his father being shot, the death of his brother, and having

been physically abused by schoolteachers and his ex-wife.  (Tr. 550).  Plaintiff reported that he

experienced bad memories, intense dreams, irritability, conscious overeating, depression with

extreme sadness, worthlessness, weight gain, and social isolation.  (*Id.*).  Plaintiff also reported

that he felt he had been wrongly terminated from a job.  (Tr. 550).  On mental status

examination, his mood was dysthymic and depressed and his affect was flat, but he otherwise

exhibited no abnormalities.  (Tr. 557).  The intake social worker assessed plaintiff with PTSD

and moderate major depressive disorder with bereavement.  (Tr. 555).  Plaintiff also underwent a

psychiatric intake that same day with Rokeya Tasnin, M.D.  (Tr. 564).  Dr. Tasnin did not note

any abnormalities and remarked that plaintiff was "tearful but cooperative[.]"  (Tr. 567).  Dr.

Tasnin increased plaintiff's Zoloft and started Trazodone.  (*Id.*).

During later June 2016 sessions, plaintiff reported finances, housing, and acquiring Social

Security benefits as stressors.  (Tr. 568, 572-73).  In September 2016, plaintiff reported that he

11

was feeling better (no longer depressed with medications), was willing to work, and had a new

job offer.  (Tr. 583).  Plaintiff's mental status examination was normal.  (Tr. 583-84).

Plaintiff underwent an updated diagnostic assessment in March 2017.  (Tr. 639).  He

reported that he "deals with depression and anxiety and . . . swings from one side to the other

emotionally" and felt like "being in a box" unable to "find his way out." (*Id.*).  He referenced

diagnoses of PTSD and explosive anger disorder and also reported feeling sad, depressed, and

irritable, with difficulty breathing and shaking.  (*Id.*).  He cited triggers of his ex-wife's two

miscarriages and her recent death due to alcoholism.  (*Id.*).  The social worker referred plaintiff

to further counseling and a continued regimen of medications for his depression, anxiety, and

PTSD.  (Tr. 640).

At an April 2017 session, plaintiff reported that he lost his job due to an "emotional melt

down[.]"  (Tr. 643).  His mood was dysthymic and depressed.  (*Id.*).  He stated that he sometimes

felt he would be "just better off dead" but also that he "would never really do it."  (Tr. 644).

On May 1, 2017, Dr. Tasnin completed a state agency questionnaire, though she reported

last seeing plaintiff eight months earlier, in September 2016.  (Tr. 545).  Dr. Tasnin indicated

that plaintiff experienced PTSD when he recalled bad memories, which would produce

nightmares, irritability, and overeating.  (Tr. 546).  Dr. Tasnin also indicated that plaintiff had

persistent depressive disorder evidenced by extreme sadness, worthlessness, lack of enjoyment,

and self-isolation.  (*Id.*).  Dr. Tasnin also reported that plaintiff experienced flashbacks, which

limit his ability to participate in functions outside of the home, and irritability, which limits his

ability to interact with people.  (*Id.*).  Dr. Tasnin noted that plaintiff's decompensation could

occur without warning—triggered by a smell, image, or sound. (*Id.*). While acknowledging an improvement in his symptoms, Dr. Tasnin noted that plaintiff required further treatment and was unable to regulate his emotions or manage distress. (Tr. 547).

On May 19, 2017, plaintiff re-established care with Dr. Tasnin and reported that he was still feeling depressed and anxious. (Tr. 654). Dr. Tasnin documented a normal mental status examination other than depressed mood. (*Id.*). In a medical source statement completed on July 27, 2017, but limited to her observations as of the May 19, 2017 visit, Dr. Tasnin indicated that plaintiff's symptoms "constantly" interfered with his ability to concentrate on simple work tasks. (Tr. 770, 772). This same observation is qualified by the notation, "per client." (Tr. 770). Dr. Tasnin also reported contact with plaintiff every 3-4 months in this statement, though her prior statement admitted an eight-month gap in contact. (Tr. 545, 769).

In August 2017, Dr. Tasnin noted plaintiff's "depressed" mood but otherwise noted no abnormal observations. (Tr. 959). Plaintiff reported that transportation and financial issues caused stress but also that extra Zoloft helped some symptoms and his sleep and appetite had improved. (*Id.*).

6.    Philip Swedberg, M.D. (consultative examination)

Dr. Swedberg examined plaintiff for disability purposes on May 24, 2017. (Tr. 609-15). Plaintiff's manual muscle testing and range of motion were normal. (Tr. 609-12). Plaintiff reported his back as his chief complaint, which originated in 2003 and was aggravated after falling off of a ladder at work. (Tr. 613). Plaintiff reported chiropractic treatment (with some benefit) and physical therapy. (*Id.*). Plaintiff reported never seeing a neurosurgeon or pain

management physician and never having had an MRI. (*Id.*). At the time of the consultative examination, plaintiff reported dull aching back pain exacerbated by prolonged ambulation or standing but denied leg weakness, leg numbness, instability, or falls. (*Id.*). Following the examination, Dr. Swedberg concluded:

> [T]his is an obese middle-aged man who states that he is unable to work due to low back pain. His physical examination was entirely normal. The patient ambulates with a normal gait and can forward bend and squat without difficulty. Range of motion of all extremities is completely normal. There was no evidence of radiculopathy.
>
> Based on the findings of this normal examination, the patient appears capable of performing a moderate to marked amount of sitting, ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects. In addition, the patient has no difficulty reaching, grasping, and handling objects. There are no visual and/or communication limitations nor are there environmental limitations.

(Tr. 615).

### 7. State agency psychologists

In May 2017, state agency psychologist Courtney Zeune, Psy.D., reviewed plaintiff's file and concluded that plaintiff was moderately limited in understanding, remembering or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (Tr. 80). In her mental RFC assessment, Dr. Zeune opined that plaintiff was moderately limited in the ability to understand and remember detailed instructions (but plaintiff could understand, remember, and carry out short cycle work); in the ability to maintain attention and concentration for extended periods; and in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (but

plaintiff could maintain concentration, persistence, and pace on short cycle work in a setting with flexible pace and production quotas). (Tr. 85). Dr. Zeune also opined that plaintiff was moderately limited in interacting with the general public, accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes (but plaintiff could interact superficially with supervisors, coworkers, and the general public). (Tr. 85-86). Finally, Dr. Zeune opined that plaintiff was moderately limited in the ability to respond appropriately to changes in the work setting (i.e., plaintiff's work should be routine with infrequent changes explained in advance). (Tr. 86). In August 2017, state agency psychologist Irma Johnston, Psy.D., reviewed plaintiff's file upon reconsideration and largely concurred with Dr. Zeune's assessment, though she found no significant limitation in plaintiff's ability to get along with coworkers or peers. (Tr. 140-41, 146-48).

### 8. State agency physicians

In June 2017, state agency physician James Cacchillo, D.O., found that plaintiff could lift and carry 50 pounds occasionally; lift and carry 25 pounds frequently; and stand, walk and/or sit for more than six hours in an eight-hour workday. (Tr. 82, 84). Dr. Cacchillo found that plaintiff could frequently stoop, kneel, crouch, and crawl; but could never climb ladders, ropes, or scaffolding. (Tr. 83). Dr. Cacchillo also limited plaintiff to no exposure to unprotected heights or hazards due to allegations of seizures. (Tr. 84). In October 2017, Diane Manos, M.D., reviewed plaintiff's file upon reconsideration and concurred with Dr. Zeune's assessment. (Tr. 143-45).

15

E.      **Specific Errors**

On appeal, plaintiff raises a single assignment of error: that the ALJ reversibly erred in evaluating the medical source opinions and medical evidence and therefore failed to meet her step five burden.  In particular, he challenges (1) the weight assigned to the opinion of consultative examiner Dr. Swedberg and, by extension, the weight assigned to the opinions of the state agency physicians that relied on Dr. Swedberg's opinion, (2) the weight assigned to the opinions of treating physicians Drs. Reddy and Tasnin, and (3) the weight assigned to the opinions of the state agency psychologists.

The Social Security regulations vest the ALJ with responsibility "for reviewing the evidence and making findings of fact and conclusions of law."  20 C.F.R. § 404.1527(e)(2).[3] Physicians render opinions on a claimant's RFC, but the ultimate responsibility for determining a claimant's capacity to work lies with the Commissioner.  *See Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010) (citing 42 U.S.C. § 423(d)(5)(B) and *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009)).  *See also* 20 C.F.R. § 404.1546(c) (the responsibility for assessing a claimant's RFC lies with the ALJ).  The ALJ is responsible for assessing a claimant's RFC "based on all of the relevant medical and other evidence."  20 C.F.R. § 404.1545(a)(3).  *See also Moore v. Astrue*, No. 07-204, 2008 WL 2051019, *5 (E.D. Ky. May 12, 2008) (citing 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c) and *Bingaman v. Comm'r of Soc. Sec.*, 186 F. App'x 642, 647 (6th Cir. 2006)).  *See also Ford v. Comm'r of Soc. Sec.*, 114 F.

---

[3] "The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical . . . and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively."  *Miller v. Comm'r of Soc. Sec.*, No. 3:18-cv-281, 2019 WL 4253867, *1 n.1 (S.D. Ohio Sept. 9, 2019) (quoting *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)).  The Court's references to DIB regulations should be read to incorporate the corresponding and identical SSI regulations for purposes of this Report and Recommendation.

16

App'x 194, 198 (6th Cir. 2004) (the RFC determination, which is part of the disability evaluation, is expressly reserved to the Commissioner).

Under the treating physician rule, an ALJ must give "controlling" weight to the opinion of a claimant's treating physician if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record. . . ." 20 C.F.R § 404.1527(c)(2).[4]  The opinion of a non-treating medical source is weighed based on the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion.  *See* 20 C.F.R. §§ 404.1527(c)(3)-(6). The opinion of a non-treating but examining source is generally entitled to more weight than the opinion of a non-examining source.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007); 20 C.F.R. § 404.1527(c)(1).  Under the Social Security regulations, "a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence . . . may constitute substantial evidence . . . adverse to the claimant" in a disability proceeding.  *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) (quoting *Richardson*, 402 U.S. at 402).  Because a non-examining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinion and

---

[4] Section 404.1527, which sets out the treating physician rule, has been amended for claims filed on or after March 27, 2017.  *See* 20 C.F.R. § 404.1520c.  The amendment does not apply to plaintiff's claims, which he filed on March 16, 2017.

the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. *See* 20 C.F.R. § 404.1527(c)(3).

       1.    <u>Dr. Swedberg (consultative examiner) and state agency physicians</u>

Plaintiff first takes issue with Dr. Swedberg's conclusion that his physical examination was "entirely normal." (Tr. 615). The Commissioner argues in response that the ALJ did not adopt this conclusion wholesale but rather gave the opinion only "some weight" (*see* Tr. 22) and assessed additional restrictions on plaintiff's abilities to lift and carry and environmental limitations. The Commissioner further argues that the state agency physicians did not rely exclusively on Dr. Swedberg's assessment—specifically citing their review of normal hip, pelvis, and knee x-rays and minimal lumbar spine x-ray findings. (*See* Tr. 102, 145). Finally, the Commissioner notes that the ALJ acknowledged that the state agency physicians' opinions were entitled to only "some weight" given the fact that other portions of the record supported additional lifting limitations. (Tr. 22).

The ALJ's decision to afford some weight to the opinions of Dr. Swedberg and the state agency physicians is based on substantial evidence. The ALJ acknowledged certain abnormal findings in the record and limited plaintiff's RFC accordingly. (*See* Tr. 22, 26) (discussing diminished grip strength, limitations related to a remote history of seizures, and other additional limitations based on subsequent medical records). The ALJ also specifically referenced the fact that the state agency physicians had relied upon hip, pelvis, knee, and spine imaging in addition to Dr. Swedberg's findings. (Tr. 22) (referencing Tr. 490, 492, 505). *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical

opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.").

In addition, the ALJ later acknowledged other evidence that supported some physical limitations, such as restricted range of motion in plaintiff's left shoulder, bilateral shoulder acromioclavicular joint arthritis, subjective reports of hand pain, degenerative disc disease, and treatments for back pain. (*See* Tr. 25-26) (referencing Tr. 59, 749, 1166, 1380, 1385-87). *See McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) ("It is clear from the ALJ's decision . . . that [he] considered the medical examinations that occurred after [the state agency physician]'s assessment."). Balancing these records with the "often . . . normal physical findings with intact range of motion, strength and sensation" (Tr. 26) (*see, e.g.,* Tr. 473, 478 (significant improvements with chiropractic treatment); Tr. 505 (minimal lumbar spine imaging findings), Tr. 511 (normal musculoskeletal findings), Tr. 700 (plaintiff describing only intermittent, moderate back pain), Tr. 713 (notation that osteoarthritis and degenerative joint disease were controlled with medication); Tr. 702, 754, 1244, 1363 (physical examinations showing normal range of motion without edema or tenderness)), the ALJ adopted light exertional level lifting and carrying restrictions, frequent fingering and overhead reaching limitations, and a requirement that plaintiff be allowed to alternate between sitting and standing and walking every 30 minutes with one-two minutes to change positions. (Tr. 26). *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 632 (6th Cir. 2016) (quoting *Blakley*, 581 F.3d at 409) (finding no error in the ALJ's reliance on non-examining sources' opinions where the ALJ gave "some indication" that the opinions had been subjected to additional scrutiny by applying greater restrictions than the non-

19

examining sources had deemed necessary and noting that he was aware of a change in the

claimant's condition post-opinions). The ALJ's decision to afford some weight to the opinions

of Dr. Swedberg and the state agency physicians is supported by substantial evidence.

    2.    Treating physicians

        a.  *Dr. Reddy*

Plaintiff points to three records—a UC Health record from June 2017 (Tr. 749)

(reflecting hand and shoulder issues), a UC Health record from September 2017 (Tr. 1161)

(reflecting diffuse tenderness and imaging consistent with degenerative joint disease), and

physical therapy records from January 2018 (Tr. 1094-1104) (reflecting pain and various

impaired mobilities)—as demonstrating that Dr. Reddy's more restrictive assessment of

plaintiff's physical limitations was "completely consistent" with the medical evidence of record.

(Doc. 14 at PAGEID 1449). The Commissioner argues in response that Dr. Reddy's opinion was

inconsistent with the record as a whole, including both medical evidence, Dr. Reddy's own

treatment notes, plaintiff's own statements, and the fact that Dr. Reddy did not have a significant

treating history with plaintiff.

As noted above, an ALJ may discount a treating physician's opinion if it is not well-

supported by medically acceptable clinical and laboratory diagnostic techniques or inconsistent

with the other substantial evidence in the record. *See* 20 C.F.R § 404.1527(c)(2). Here, the ALJ

identified a number of inconsistencies between Dr. Reddy's opinion and the rest of the record.

The ALJ noted that Dr. Reddy's July 10, 2017 RFC questionnaire (Tr. 769-76) was inconsistent

with Dr. Reddy's own contemporaneous records (*see, e.g.,* Tr. 762 (noting that plaintiff reported

only intermittent, mild back pain), Tr. 713 (osteoarthritis and degenerative disc disease were controlled with medication)), the records of those in her practice (*see, e.g.,* Tr. 749, 1244 (normal range of motion, no edema, no tenderness)), and other relatively recent records (*see, e.g.,* Tr. 615 (Dr. Swedberg's normal findings during the consultative examination)). (*See* Tr. 23). The ALJ also noted that examinations subsequent to Dr. Reddy's opinion showed only mild findings. (Tr. 24-25) (citing, e.g., Tr. 1180, 1198, 1203 (no musculoskeletal abnormalities); Tr. 1218 (hand, feet, knee, and pelvis images showed only small calcaneal heel spurs, minimal osteoarthritic change in the patellofemoral joint spaces bilaterally, and bony prominence along the superolateral acetabulum)). The ALJ reiterated that prior imaging of plaintiff's spine reflected only minor abnormalities. (Tr. 25) (citing Tr. 505 ("minimal degenerative disc disease with a small amount of hyperthrophic spurring") and Tr. 541 ("mild" degenerative spine changes)). The ALJ's decision to discount the weight of Dr. Reddy's opinion is therefore supported by substantial evidence.

If an ALJ determines that a treating physician's opinion is not entitled to controlling weight, then the opinion is evaluated using the criteria listed in 20 C.F.R §§ 404.1527(c)(2)(i)-(ii) and (3)-(6). The ALJ explicitly discussed the fact that plaintiff and Dr. Reddy had neither a long nor frequent treatment history. (*See* Tr. 23) ("[Dr. Reddy] . . . really had not seen [plaintiff] for many visits at [the time she rendered her opinion]."). *See also* 20 C.F.R § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). The ALJ also noted that, while Dr. Reddy's opinion included significant restrictions, the notes from

plaintiff's visit with Dr. Reddy *on the same date as this opinion* reflected that "no treatment was changed and no follow-ups ordered, nor was [] [plaintiff] to seek pain management or specialist evaluations." (Tr. 23). *See* 20 C.F.R § 404.1527(c)(2)(ii) ("We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories."); 20 C.F.R § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."). Finally, the discussion above concerning whether Dr. Reddy's opinion was entitled to controlling weight demonstrates the ALJ's consideration of 20 C.F.R § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.") and § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

In sum, the ALJ's decision makes clear the several reasons why she chose to discount Dr. Reddy's opinion. *See Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011) (quoting *Wilson*, 378 F.3d at 544) ("[The good-reasons requirement] is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that [ ]he is not.'"). Accordingly, the ALJ provided good reasons for the weight given to Dr. Reddy's opinion. *See* 20 C.F.R. § 404.1527(c)(2).

Plaintiff last argues that the ALJ improperly interpreted raw medical data in functional terms when she found no evidence to support Dr. Reddy's lifting limitation notwithstanding medical evidence showing his shoulder issues.  The laboratory evidence demonstrating plaintiff's shoulder issues (*see* Tr. 1380) (January 2019 shoulder x-rays) was obtained well-after Dr. Reddy rendered her opinion in July of 2017.  Plaintiff cites several cases suggesting that the ALJ was therefore required to obtain an additional opinion from a medical expert.  *See Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 910, 912 (N.D. Ohio 2008) (the ALJ's decision did not rest on substantial evidence where the record contained only one medical opinion from a state agency reviewing physician, who had not reviewed two subsequent years of treatment records); *Smiley v. Comm'r of Soc. Sec.*, 940 F. Supp. 2d 592, 601 (S.D. Ohio 2013) (remanding where the ALJ's RFC was not consistent with a single medical opinion of record *and* the record as a whole "contradicted" the ALJ's RFC finding); *Mitsoff v. Comm'r of Soc. Sec.*, 940 F. Supp. 2d 693, 702 (S.D. Ohio 2013) (ALJ's decision did not rest of substantial evidence where it relied on medical opinions predating significant surgeries).

The Court finds that these cases are distinguishable from the record in this case, both in that the conditions postdating the relied-upon reports were more severe and the medical records otherwise contradicted the ALJs' conclusions in those cases.  Here, the ALJ discussed the fact that plaintiff let significant time pass after first mentioning shoulder pain in mid-2017 before pursuing additional treatment.  (*See* Tr. 24) (comparing Tr. 749 (June 2017 UC Health record noting restricted range of motion in left shoulder) with Tr. 1380, 1385 (January 2019 shoulder x-rays and examination notes from Dr. Reddy)).  Moreover, at the January 2019 examination,

plaintiff described his shoulder pain as "moderate" without "numbness or stiffness." (Tr. 1385). The ALJ also noted that plaintiff's testimony regarding his shoulder suggested that the primary effect was on his reaching abilities. (Tr. 21) (citing Tr. 60) ("Q. And with your shoulders how are they affecting your ability to do your daily activities? A. Limited, because I can only reach up to about right here.").

Under these circumstances, and given the balance of the evidence in the medical record discussed above, the Court does not find that an updated medical opinion was necessary in this case. *See Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009) (quoting the Magistrate Judge's opinion) ("Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand."). *Cf. Coldiron*, 391 F. App'x at 439 (citing *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x. 149, 157 (6th Cir. 2009)) ("An ALJ does not improperly assume the role of a medical expert by weighing the medical and non-medical evidence before rendering an RFC finding."); *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (citing 20 C.F.R. § 416.920(a)(4)(iv)) ("[T]he ALJ is charged with the responsibility of evaluating the medical evidence and the claimant's testimony" to formulate the plaintiff's RFC). The ALJ was not required to further develop the record regarding plaintiff's shoulder issues, and her decision to discount Dr. Reddy's opinion is supported by substantial evidence.

b. *Dr. Tasnin*

Plaintiff argues that the ALJ improperly discounted Dr. Tasnin's two opinions regarding his mental limitations due to being based on plaintiff's self-reports. Plaintiff also points to

24

numerous mentions of depression throughout the record[5] and suggests that the ALJ substituted her own judgment over that of a mental health professional. Finally, plaintiff argues that his strong work history prior to his alleged disability onset weighs in favor of adopting his alleged symptom severity. The Commissioner argues in response that Dr. Tasnin's first opinion was inconsistent with his own treatment notes, plaintiff's testimony, and plaintiff's work history. The Commissioner also argues that Dr. Tasnin's first opinion was remote from his actual treatment of plaintiff. As to Dr. Tasnin's second opinion, the Commissioner argues that it relied primary on plaintiff's self-reports, was inconsistent with plaintiff's other statements regarding his mental health and daily activities, and was inconsistent with the medical record. The Commissioner also argues that Dr. Tasnin's second opinion was based on only a limited treatment relationship with plaintiff.

Like with Dr. Reddy, the ALJ cited the inconsistency of Dr. Tasnin's opinions with the record as the primary reason for discounting those opinions. (*See* Tr. 27). *See also* 20 C.F.R § 404.1527(c)(4). Dr. Tasnin's first opinion includes the statements that plaintiff was limited in his ability to socially interact and interact outside his home, had difficulty "get[ting] out of bed in the morning[,]" and "[wa]s not able to regulate his emotions to manage distress tolerance *at this time*[.]" (Tr. 602-03) (emphasis added) (dated May 1, 2017). The ALJ contrasted this first opinion with the examination notes of Dr. Tasnin's most recent prior visit with plaintiff, which stated that plaintiff "admit[ted] feeling better and no longer feeling depressed since taking medication" and was "willing to work . . . and ha[d] a new job offer." (Tr. 633). At this visit,

---

[5] Plaintiff specifically highlights a record that he contends reflects his "suicidal ideation." (Doc. 14 at PAGEID 1451). In the same record, however, plaintiff admits that he "would never really do it." (Tr. 644). (*See also* Tr. 666) ("The client stated that he was safe due to his spiritual beliefs. . . . [H]e would not act on his thoughts.").

plaintiff also reported good sleep and appetite and Dr. Tasnin noted that plaintiff was "pleasant and cooperative," presented a "low risk of harm to self and others[,]" and was "making progress toward his goals." (Tr. 633-34). The ALJ also noted that this first opinion, itself, acknowledges that plaintiff's symptoms had improved. (*See* Tr. 26) (referencing Tr. 603). The ALJ also noted that plaintiff testified as to his strong job history, which he maintained even after the onset of his mental health problems. (*See* Tr. 26-27).[6]

In her second opinion (Tr. 769-72) (dated July 27, 2017), Dr. Tasnin stated that plaintiff's symptoms would "constantly" interfere with his attention and concentration in even low stress jobs and he was therefore incapable of tolerating any work stress. (Tr. 770). The ALJ noted that this observation appeared to be based primarily on plaintiff's own representation. (*See* Tr. 27). Otherwise, this opinion appeared based on the easy triggering of plaintiff's PTSD, the events giving rise to which "were extremely remote such that [plaintiff] had successfully been able to work despite these symptoms throughout his adult work history" and without significant issue. (*Id.*).

The ALJ also noted that Dr. Tasnin purported to have had contact with plaintiff "every 3-4 months since 6/15/2016" (Tr. 769) when, in fact, Dr. Tasnin's first opinion admitted that her last contact with plaintiff was eight months prior that opinion. (*See* Tr. 27) (citing Tr. 601 (May 2017 opinion reflecting the date she had last seen plaintiff as September 2016)). In addition, at the visit most closely predating Dr. Tasnin's second opinion, her notes reflect the relative stability of plaintiff's mental health impairments. (*See* Tr. 28) (citing Tr. 654-55) (noting, e.g.,

---

[6] Dr. Tasnin's first opinion reflects that plaintiff had been experiencing his mental health symptoms since mid-2014 or earlier. (Tr. 603). Plaintiff's testimony at the administrative hearing demonstrates at least approximately a year and a half of strong work history overlapping with his mental health symptoms. (*See* Tr. 47-51).

that plaintiff was "willing to work[,]" "live[d] by himself[,]" was "pleasant and cooperative[,]" "coherent[,]" and a "low risk of harm to self and others" notwithstanding a depressed mood).

The ALJ also considered the ways in which plaintiff's own testimony undercut Dr. Tasnin's severely limited assessments of his mental RFC. (*See* Tr. 27). Plaintiff testified about and otherwise reported participating in activities outside the home, such as church, choir practice, grocery shopping, and vacation. (*See* Tr. 54-55, 360, 1277). Plaintiff was also able to adapt from living alone to cohabitating with his girlfriend. (*See, e.g.,* Tr. 984, 990) (counseling records reflecting discussion of this transition).

Finally, the ALJ considered mental health records that postdated both of Dr. Tasnin's opinions. (*See* Tr. 28). Many of these records reflect normal mental health findings and improvement with treatment. (*See, e.g.,* Tr. 959 (in August 2017, reporting that extra Zoloft helped and that symptoms were related to transportation and financial difficulties); Tr. 986 (in October 2017, reporting feeling less depressed and anxious, sleeping and eating better, and that finances were a primary stressor); Tr. 1005 (in December 2017, reporting feeling "much better and den[ying] feeling depressed and anxious" with improved sleep and appetite). By mid to late 2018, plaintiff reported that he did not feel depressed or anxious and/or was doing well or improving on several occasions. (*See, e.g.,* Tr. 1317, 1335, 1340).

Based on the above, the Court finds that the ALJ's decision to discount Dr. Tasnin's opinions is based on substantial evidence. The Court is not persuaded otherwise by plaintiff's citation to a string of medical records that document plaintiff's depression (*see* Doc. 14 at PAGEID 1451) but say nothing about the depression's impact on plaintiff's functional abilities.

27

Likewise, the Court is not persuaded by the cases cited by plaintiff for the propositions that the ALJ improperly focused on the fact that many of Dr. Tasnin's observations appear rooted in plaintiff's self-reported symptoms (*see* Doc. 14 at PAGEID 1450-51) and that a strong work history prior to his alleged onset date weigh in favor of assigning his symptom reports a greater degree of credibility (*see id.* at PAGEID 1452). The ALJ's decision to discount Dr. Tasnin's opinions is properly based on the substantial evidence discussed above. *Cf. Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.").

Finally, the ALJ provided good reasons for the weight she afforded Dr. Tasnin's opinions. The ALJ discussed the fact that Dr. Tasnin had not frequently or regularly treated plaintiff. (*See* Tr. 27-28). *See also* 20 C.F.R § 404.1527(c)(2)(i). The discussion above concerning whether Dr. Tasnin's opinions were entitled to controlling weight demonstrates the ALJ's consideration of the consistency and supportability of Dr. Taslin's opinions. *See* 20 C.F.R §§ 404.1527(c)(3), (4). These considerations, documented in the ALJ's decision, meet the good reasons requirement under 20 C.F.R § 404.1527(c)(2).

### 3. State agency psychologists

Plaintiff last argues that the ALJ gave great weight to the opinions of the state agency psychologists without adopting their opinions that plaintiff was limited to only "superficial" interaction with others. (*See* Tr. 86, 147). Specifically, plaintiff argues that the ALJ's interpretation of their opinions into the vocationally relevant terminology of "occasional" was

improper, because "superficial" connotes the quality of interactions while "occasional" connotes the temporal nature of interactions. The Commissioner argues in response that while there may be a distinction between these terms, plaintiff has failed to put forth any particular definition of "superficial" that would undercut the ALJ's mental RFC determination. The Commissioner further argues that, in determining plaintiff's RFC, the ALJ is tasked with resolving "ambiguities in the evidence[,]" SSR 96-8P, 1996 WL 374184, *7, and did so here by synthesizing their opinions into a "vocationally relevant limitation *supported by the record*." (Tr. 26) (emphasis added).

The Court finds that the ALJ's mental RFC is based on substantial evidence. This determination is reserved to the Commissioner, who "must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record." SSR 96-5P, 1996 WL 374183, *3. As noted above, the ALJ conducted a thorough review of plaintiff's medical records, which generally reflected normal findings other than depressed mood. Given that and the fact that the ALJ included limitations on the nature/quality (as opposed to only the frequency) of interactions, the Court finds that the ALJ's mental RFC determination took the state agency psychologists' opinions regarding "superficial" interactions into account and was based on substantial evidence. (*See* Tr. 20) (stating that plaintiff could occasionally interact with coworkers and the public but without "*tandem or shared tasks*" and "*not in a customer service capacity*").

The Court is not persuaded otherwise by the cases plaintiff cites in support of his position. In *Hutton v. Comm'r of Soc. Sec.*, No. 2:20-cv-339, 2020 WL 3866855 (S.D. Ohio July

29

9, 2020), *report and recommendation adopted*, 2020 WL 4334920 (S.D. Ohio July 28, 2020), the state agency psychologists' opinions at issue stated that the plaintiff could "interact briefly and occasionally in situations that do not require more than superficial contact with coworkers and supervisors. . . ." *Id.* at *4. The fact that these opinions included both the term "occasionally" and "superficial" suggests that they meant distinct things by each. The same is not the case here, where the state agency psychologists used only the term "superficial." In addition, unlike in *Hutton*, the ALJ here accommodated the state agency psychologists' use of the term "superficial" both by limiting plaintiff to occasional interactions *and* including limitations on the quality of interactions. (*See* Tr. 20).

In *Perrine v. Berryhill*, No. 1:18-cv-49, 2019 WL 1331597 (N.D. Ohio Mar. 25, 2019), the court found that a remand was warranted because the ALJ both failed to explain why he did not adopt the "superficial" limitation included in the state agency psychologists' opinions and there was no other medical evidence cutting against that restriction. *Id.* at *7. Here, the ALJ both explicitly acknowledged the state agency psychologists' use of the term "superficial" and explained that she interpreted the meaning of this term in a manner that was consistent with the record medical evidence as a whole. (Tr. 26).

Having rejected each of plaintiff's arguments, his assignment of error should be overruled. The Court finds that the ALJ's evaluation of the medical opinions and medical evidence in the record and corresponding RFC determination are supported by substantial evidence.

**IT IS THEREFORE RECOMMENDED** that the decision of the Commissioner be

**AFFIRMED** and this matter **CLOSED** on the docket of the Court.

Date:   11/30/2021

Karen L. Litkovitz
United States Magistrate Judge

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

EDDIE W. STAMPER,                                    Case No. 1:20-cv-467
     Plaintiff,                                        Black, J.
                                                     Litkovitz, M.J.
vs.

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant.


**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of
the recommended disposition, a party may serve and file specific written objections to the
proposed findings and recommendations.  This period may be extended further by the Court on
timely motion for an extension.  Such objections shall specify the portions of the Report objected
to and shall be accompanied by a memorandum of law in support of the objections.  If the Report
and Recommendation is based in whole or in part upon matters occurring on the record at an oral
hearing, the objecting party shall promptly arrange for the transcription of the record, or such
portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the
assigned District Judge otherwise directs.  A party may respond to another party's objections
**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in
accordance with this procedure may forfeit rights on appeal.  *See Thomas* v. *Arn,* 474 U.S. 140
(1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).